UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNY LOVEJOY, | ) | CASE NO. 5:15CV1487 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Johnny Lovejoy ("Lovejoy"), seeks judicial review of the final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and REMANDED.

**I.  Procedural History**

On February 21, 2012, Lovejoy protectively filed a Title II Application for a period of disability and disability insurance benefits. (Tr. 164)  He also protectively filed a Title XVI

application for supplemental security income on February 21, 2012. (Tr. 171)  Mr. Lovejoy alleged his disability began on December 10, 2011. (Tr. 39)  He claimed he was disabled due to a back injury, arthritis, no cartilage between knee and bone, depression and anxiety. His application was denied initially and upon reconsideration.  (Tr. 57)  Mr. Lovejoy requested an administrative hearing.  (Tr. 6)  An administrative hearing was held on March 13, 2014 by Administrative Law Judge James Hill.  (Tr. 30)

In a decision dated March 21, 2014, the ALJ determined that Mr. Lovejoy was not under a disability from December 10, 2011 through the date of his decision.  (Tr. 12)  Lovejoy requested review of the ALJ's decision. (Tr. 8)  The ALJ's decision became final on May 29, 2015 when the Appeals Council denied Lovejoy's request for review.  (Tr. 1-3)

## II.  Evidence

### A.  Personal, Educational and Vocational Evidence

Lovejoy was born on November 6, 1971.  (Tr. 38)  The highest grade of school he completed was sixth grade.  (Tr. 38)  Lovejoy's past relevant work includes work as an automobile mechanic and as a tow truck operator.  (Tr. 40)

### B.  Medical Evidence

#### 1.  Physical Illness

In March 2006, prior to the onset of his alleged disability, Lovejoy underwent a L4-5 discectomy.  (Tr. 255-256)  As stated above, Lovejoy claims that his disability began on December 10, 2011. (Tr. 39)  From September 15, 2011 through January 4, 2012, plaintiff received medical treatment from pain management specialist, Dr. Syed Akhtar-Zaidi.  (Tr. 328-335)  Plaintiff complained of back pain, with pain, numbness and tingling radiating down his right leg.  (Tr. 331-334)  Plaintiff had tenderness and spasm in the paracervical and paralumbar

muscles.  (Tr. 331-335)  According to Dr. Akhtar-Zaidi's office notes, Lovejoy had normal upper and lower extremity sensation and strength.  (Tr. 331-335)  The office notes also reflect that Lovejoy displayed a normal gait. (Tr. 331-335)  Dr. Akhtar-Zaidi treated Lovejoy for cervical and lumbar radiculitis, as well as sciatica.  (Tr. 331-335) He prescribed Opana 30mg and Percocet, although the Percocet was discontinued in November 2011.  (Tr. 332, 335)  He also ordered a lumbar MRI and offered a lumbar root injection.  (Tr. 331-335)

From August 2012 through February 2014, Lovejoy received medical treatment from Dr. Martin Escobar.  (Tr. 346-428, 446-466)  At his first visit, Lovejoy sought treatment for acute lumbar spasm and knee pain.  (Tr. 359)  He complained of his right knee giving out, low back pain and pain with walking.  (Tr. 352, 353, 355-359)  Lovejoy also had an abscess during this time period. (Tr. 351-358)  Lovejoy presented to Dr. Escobar on seven occasions between August 2012 and January 2013.  (Tr. 351-358)  During this time, there were abnormal findings on positive straight leg raising tests and right knee crepitus.  (Tr. 351-358)  Lovejoy displayed a normal gait during this period.  (Tr. 351-358)

X-rays performed on August 22, 2012 revealed osteoarthritis in plaintiff's left knee.  (Tr. 371)  Cervical X-rays performed on the same date revealed mild degenerative disc disease at C4-5, C5-6, C6-7 and minimal "osteophytic Richman[sic]," elsewhere referred to as encroachment, into the right C5 and left C4 neural foramina.  (Tr. 372)  Lumbar X-rays revealed lumbar levoscoliosis and multilevel spondylosis.  (Tr. 373)  Dr. Escobar prescribed Vicodin for pain. (Tr. 360-365.)

In January 2013, Lovejoy complained of knee pain, low back pain, and cracking in the foot. (Tr. 351)  Dr. Escobar's diagnosis was sprains of the low back, knee and foot.  Plaintiff presented to Dr. Escobar on two occasions between February and March 2013.  (Tr. 399-400)

Dr. Escobar's notes again indicate that Lovejoy had a normal gait during this period.  (Tr. 399-400)  Plaintiff returned to Dr. Escobar in April 2013 with complaints of worsening lower back and gluteal back pain radiating to the left knee. (Tr. 396)  Physical examination revealed tenderness in the lumbar area and flexion restricted due to pain. (Tr. 396)  Lovejoy was diagnosed with chronic back pain and told to avoid lifting and pushing anything that will cause his symptoms to flare.  (Tr. 394,397)  Plaintiff returned to Dr. Escobar the next month with lumbar spine pain aggravated by bending, twisting and stress. (Tr. 392)  Dr. Escobar told Lovejoy to continue with his present medications and to avoid heavy lifting or pushing or anything that would flare his symptoms.  (Tr. 394)

In June 2013, in addition to his complaints of chronic back pain, Lovejoy also complained of neck and knee pain to Dr. Escobar.  (Tr. 389)  Physical examination revealed tenderness of the lumbar area, flexion limited due to pain, knee tenderness, and crepitus, cervical tenderness and limited lateral rotation secondary to pain.  (Tr. 391)  Plaintiff was diagnosed with chronic back pain, lumbar and cervical degenerative disc disease and a knee sprain.  (Tr. 391)  Dr. Escobar advised Lovejoy to "continue with present meds, avoid heavy lifting or pushing or anything that will flare symptoms, … and to avoid squatting, jumping, or kneeling…" (Tr. 391)

From July through August 2013, Lovejoy was found to have limited range of motion, tenderness of the S1 joint area, bilateral positive straight leg raise, and knee crepitus and tenderness.  (Tr. 385, 388)  He was again told to avoid heavy lifting or pushing or anything that will flare symptoms.  (Tr. 385, 388)

From September through November 2013, Lovejoy had complaints of constant pain in the gluteal and lumbar spine, bilateral knee pain, left shoulder and right elbow pain.  (Tr. 374, 377)  Physical examination revealed limited range of motion, tenderness of the S1 joint area,

bilateral positive straight leg raise, reduced range of motion of the left shoulder and right elbow tenderness.  (Tr. 376, 379, 381)  Dr. Escobar diagnosed chronic back pain, and strains of the shoulder and elbow.  (Tr. 376, 379, 382).  Mr. Lovejoy was advised to avoid heavy lifting or pushing or anything that will flare symptoms.  (Tr. 379, 382)

On November 18, 2013, Dr. Escobar completed a form concerning Lovejoy's physical abilities.  (Tr. 426-27)  Dr. Escobar opined that Mr. Lovejoy could occasionally lift three to five pounds and rarely climb, balance, stoop, kneel, crouch and crawl. (Tr. 426-427)  Dr. Escobar also opined that plaintiff should limit exposure to temperature extremes. (Tr. 426-427)  Dr. Escobar indicated that plaintiff's pain would interfere with concentration and cause him to be off task. (Tr. 427)  Finally, Dr. Escobar opined that plaintiff required an at-will sit/stand option and would need to elevate his legs.  (Tr. 427)

Lovejoy presented to Dr. Escobar on November 19, 2013. (Tr. 374-376)  In addition to his other conditions, Lovejoy complained of left shoulder and right elbow pain.  (Tr. 374)  On examination, Lovejoy had right elbow tenderness and left shoulder tenderness and limited motion.  (Tr. 376)  Dr. Escobar diagnosed shoulder sprain, elbow sprain and chronic back pain. (Tr. 376)  Dr. Escobar advised plaintiff to continue with his medications, avoid heavy lifting or pushing or anything that would flare his symptoms.  (Tr. 376)

In December 2013, Lovejoy returned to Dr. Escobar for treatment of lower back pain. (Tr. 452)  He was taking medication including Norco (pain mediation), Colace (laxative), Elavil (anti-depressant medication), and Buspar (anti-anxiety medication). (Tr. 452)  On examination, plaintiff has the same lumbar spine findings as prior visits.  (Tr. 452)  Dr. Escobar advised Lovejoy to continue with his present medications and to avoid heavy lifting or pushing or anything that will flare symptoms. (Tr. 454)

Lovejoy presented to Dr. Escobar again in January 2014 for treatment of his knee, back and shoulder pain.  (Tr. 449)  Dr. Escobar's office notes from this visit include a report of mental health problems.  (Tr. 449)  The notes report that Lovejoy has negative symptoms and somatic symptoms. (Tr. 449)  They further note that Lovejoy reported no suicidal ideation.  (Tr. 449)  On examination, plaintiff had left shoulder tenderness and crepitus and knee crepitus.  (Tr. 451)  His lower back findings were the same as on prior examinations.  (Tr. 451)  Dr. Escobar again advised Lovejoy to continue with his present medications, to avoid heavy lifting or pushing or anything that will flare symptoms and to avoid squatting, jumping, kneeling.  (Tr. 451)

Lovejoy visited Dr. Escobar in February 2014 for his neck, knee, and back pain.  (Tr. 446)  He had pain on lower back movement, limited lower back movement, tenderness in the sacroiliac joint, and positive straight leg raising tests. (Tr. 448)  Plaintiff had normal lower extremity strength, reflexes, and sensation (Tr. 448).  He could stand and walk on his heels and toes and squat.  (Tr. 448)  Plaintiff displayed cervical spine tenderness and limited range of motion.  (Tr. 448)  Dr. Escobar advised plaintiff to continue with his present medications, to avoid lifting, pushing or anything that will flare symptoms and to avoid squatting, jumping or kneeling.   (Tr. 448)

### 2.  Mental Illness

On January 25, 2012, plaintiff presented to a social worker at Coleman Professional Services.   (Tr. 310)  He complained of depression, trouble sleeping and suicidal ideation, including holding a gun to his head. (Tr. 310)  He wanted to get into a detox facility to get off of his pain medications.  (Tr. 310)  Plaintiff was offered a 23 hour observation hold, but he declined.  (Tr. 310)  Lovejoy was diagnosed with a depressive disorder, opioid dependence and

assigned a Global Assessment of Functioning Score of 35. (Tr. 326-327)  Lovejoy was scheduled for counseling, case management, and residual assistance services.  (Tr. 306)

On January 31, 2012, Lovejoy underwent a diagnostic assessment at Coleman Professional Services with Dr. Frank J. Gorbett. (Tr. 291-309)  Plaintiff complained of lethargy, anhedonia, and suicidal ideation.  (Tr. 292, 303).  Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe, without psychotic features and opioid dependence.  He was assigned a Global Assessment of Functioning Score of 34.  (Tr. 307-308)

On February 15, 2012, plaintiff was brought to pre-hospital screening directly from his counseling session due to a recent suicide attempt.  (Tr. 272)  Lovejoy described feeling hopeless and depressed.  (Tr. 272)  He was offered a 23 hour observation period, but declined.  (Tr. 272)  On February 24, 2012, Lovejoy presented to Coleman Professional Services complaining of feeling depressed, frustrated and having low energy.  (Tr. 266)  He reported that he had stopped his medications, Methadone and Opana, and still experienced severe pain in his knees and low back.  (Tr. 266)  He also reported having trouble sleeping.  (Tr. 266)  The progress notes indicate that Lovejoy "cannot work in any gainful employment due to low mood, anergy [sic], and low motivation and concentration." (Tr. 270)   Plaintiff's diagnosis remained Major Depressive Disorder, recurrent, severe, without psychotic features, and opioid dependence.  (Tr. 269)  He was assigned a Global Assessment of Functioning Scale of 45 (Tr. 269-270).  It appears that plaintiff was prescribed Trazodone (anti-depressant), Cymbalta (anti-depressant), and Atenolol (a beta blocker) on February 24, 2012.  (Tr. 267).

On March 6, 2012, plaintiff was examined by Heather Shahan, a clinical nurse specialist, at Coleman Professional Services.  (Tr. 261)  Lovejoy stated that he continued to struggle with anxiety but had some improvement with his depression.  (Tr. 261)  Plaintiff's diagnosis remained

Major Depressive Disorder, recurrent, severe, without psychotic features and opioid dependence. (Tr. 263)  He was assigned a Global Assessment of Functioning Score of 45.  (Tr. 263).

Lovejoy continued to receive mental health treatment from Coleman Professional Services from April 2012 through May 6, 2013. (Tr. 336-345, 428-445)  He complained of impaired sleep, pain and struggling with anxiety.  (Tr. 336)  According to the office notes from a session on August 3, 2012, plaintiff stated that he used to be a tow truck driver but lost his job because he had no license.  (Tr. 336)  On examination, Lovejoy was found to have a preoccupied thought process, withdrawn personality, and persistent anxiety and depression, due in part to pain.  (Tr. 338, 344, 434, 439)  Plaintiff was diagnosed with major depressive disorder, severe, without psychotic features, generalized anxiety disorder, mood disorder, insomnia and opioid dependence.  (Tr. 338)  He was assigned a Global assessment of Functioning score ranging from 45 to 50 during these visits.   (Tr. 339, 344, 436)   During this time period, Lovejoy was prescribed various medications: Cymbalta 60mg, Trazadone 100 mg, Topamax 100 mg, Atenlol 50 mg, and Abilify 5mg. (Tr. 339, 439-441).

### C.  Opinion Evidence

#### 1.  Treating Source – <u>Dr. Escobar</u>

There is no dispute that Dr. Escobar was Lovejoy's treating physician.  (Doc. 11, pp. 20-21, Doc 14, p.4)  Dr. Escobar treated Lovejoy from August 2012 through February 2014. (Tr. 346-428, 446-466)  Dr. Escobar completed a Medical Source Statement on November 18, 2013. (Tr. 426-427)  In this statement, Dr. Escobar indicates that Lovejoy can occasionally carry three to five pounds. (Tr. 426)  He also indicates that he can rarely climb, balance, stoop, crouch, kneel, and crawl. (Tr. 426)   He also indicates that temperature extremes could affect Mr. Lovejoy's impairment and that his pain could interfere with his concentration or take him off

task. (Tr. 427)  Dr. Escobar's Medical Source Statement also indicates that Mr. Lovejoy needs to be able to alternate between sitting, standing and walking at will and that he needs to elevate his legs at will.  (Tr. 427)

### 2. State Agency Reviewers

#### a. **Dr. Anton Friehofner**

In April 2012, Dr. Anton Friehofner reviewed the medical records for the state DDS and created an assessment of plaintiff's physical limitations.  (Tr. 63-65)  Dr. Friehofner opined that plaintiff could: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and walk for six hours per workday; and sit for six hours per workday.  (Tr. 64)  He stated that plaintiff could occasionally climb ladders, ropes, and scaffolds and frequently stoop, kneel, crouch, crawl, and climb ramps and stairs.  (Tr. 64)

#### b. **Karla Voyten, Ph.D.**

In June 2012, Karla Voyten, Ph.D., reviewed the medical record for the state DDS and wrote an assessment of Plaintiff's mental limitations.  (Tr. 62-63, 65-66)  She opined that plaintiff has a mild restriction in daily activities of daily living and moderate limitations in social functioning and concentration, persistence, or pace.  (Tr. 62)  Dr. Voyten found that plaintiff was limited to simple to moderately complex tasks in a setting without strict deadlines or quotas and could handle superficial interactions.  (Tr. 65-66)

#### c. **Karen Terry, Ph.D.**

In September 2012, Karen Terry, Ph.D., reviewed the medical records and assessed plaintiff's mental abilities.  (Tr. 99-100, 102-103).  Dr. Terry found the same limitations as Dr. Voyten, and added that plaintiff could perform job duties that remained relatively static with any

necessary changes occurring infrequently with adequate, easy explanations.  (Tr. 65-66, 102-103).

### D.    Testimonial Evidence

#### 1.  Lovejoy's Testimony

Lovejoy was represented by counsel and testified at the hearing.  (Tr. 37-50)  Lovejoy testified that he was 5'10 and 318 pounds.  (Tr. 38)  He did not have a driver's license so his brother drove him to the hearing.  (Tr. 38)  Sixth grade was the highest grade he completed in school.  (Tr. 38)  Lovejoy testified that he had previously worked as an automobile mechanic and a tow truck operator.  (Tr. 40)

Lovejoy testified that he was unable to work because he could not sit or stand for long periods of time, due to pain, mainly in his knees.  (Tr. 42, 45)  He stated that some days were worse than others and things like the weather could inflame his knee pain.  (Tr. 43)  He indicated that he lies in bed seven to eight hours a day.  (Tr. 42)  Lovejoy also stated that walking for more than four to five minutes at a time inflames his back. (Tr. 42)  Lovejoy testified that his back pain travels to his buttocks and down his right leg.  (Tr. 43)  He said that he experiences this pain every day.  (Tr. 43)  Lovejoy also has had problems with his neck.  (Tr. 43-44)  He has a constant dull pain that worsens when he lies down for long periods of time.  (Tr. 43-44)  Lovejoy testified that he was unable to get a good night's sleep because of pain in his back.  (Tr. 46)  Lovejoy takes muscle relaxers and pain medication to deal with his pain.  (Tr. 44)  He also uses ice packs and heating pads.  (Tr. 48)

When asked whether he could stand for an hour, Lovejoy testified that he could not.  (Tr. 44)  Lovejoy estimated that he could stand for no more than 12-15 minutes, due to the pain in his knees.  (Tr. 44)  He stated that he had difficulty bending, stooping, and squatting.  (Tr. 44)  He

also testified that he had some trouble with fine manipulation with his hands.  (Tr. 45)  He testified that his hands had gone numb in the past.  (Tr. 45)

When questioned about lifting objects, Lovejoy stated that he could probably lift an object weighing 20 pounds if his life depended on it.  (Tr. 45)  However, he denied the ability to lift 20 pounds from the floor to bench level 30-40 times per day.  (Tr. 45)

Lovejoy testified that he felt somewhat depressed.  (Tr. 45)  He further testified that his depression impacted his ability to maintain concentration and focus.  (Tr. 46)  However, he denied having any memory problems.  (Tr. 46)  Lovejoy indicated that he felt uncomfortable when he was around more than two to three people. (Tr. 46)

Lovejoy represented that he is not having any trouble with personal hygiene: shaving, showering or bathing. (Tr. 46)  He also stated that he does his own cooking and cleans up around his trailer.  (Tr. 46-47)  His brother picks up his laundry and takes it to Lovejoy's mother.  (Tr. 47)  His brother also takes him grocery shopping.  (Tr. 47)

Lovejoy spends most of his day watching TV.  (Tr. 47)  He often stays awake until 3:00 or 4:00 in the morning because he can't sleep.  (Tr. 48)  He occasionally reads the Bible during that time.  (Tr. 49)  Lovejoy also got a dog for company.  (Tr. 49)

### 2. Vocational Expert's Testimony

Vocational Expert ("VE"), Thomas Nimberger, testified at the hearing.  (Tr. 50-55)  The VE considered Lovejoy's past work to be: 1) a radiator mechanic, which he described as a medium skilled position; and 2) a tow truck operator, which he described as a medium, semi-skilled job. (Tr. 51)

The ALJ asked the VE to assume that a younger person with a marginal education and the same work history as Lovejoy could perform light work. (Tr. 52)  He also told him to assume

that this person could not climb ladders, ropes or scaffolds, but could occasionally stop, kneel, crouch, and crawl. (Tr. 52)  He was instructed to assume that this person could understand, remember, and carry out simple instructions and perform simple routine tasks. (Tr. 52)  The VE was also instructed to assume that this person can perform most stress work not involving strict quotas or fast-paced high production demands or work not requiring negotiation, arbitration, confrontation, directing the work of others or being responsible for the safety of others.  (Tr. 52)  He was also told to assume that this person requires a relatively static work environment where changes occur infrequently and are adequately and easily explained.  (Tr. 52)  Finally, the VE was told to assume that the person could interact superficially with the public and coworkers. (Tr. 52)

The VE testified that such a person would not be able to perform any of Lovejoy's past work.  (Tr. 52)  However, he testified that such a person could perform other existing jobs in the regional and national economies. (Tr. 52)  The VE opined that the described individual could be: 1) a packager, with approximately 875 jobs available in northeast Ohio and 88,000 nationwide; 2) a cafeteria attendant, with 710 jobs available locally and 92,000 nationwide; and 3) an office cleaner, with 900 jobs available locally and 85,000 nationwide.  (Tr. 52-53)

For his second hypothetical, the VE was instructed that the person described in hypothetical number 1 was also limited to sedentary work. (Tr. 53)  The VE testified that such a person could be: 1) a polisher, with 410 local jobs available and 39,000 nationwide; 2) a document preparer, with 910 local jobs and 52,000 nationwide; and an order clerk, with 305 local jobs available and 49,000 nationwide. (Tr. 53)

For hypothetical number three, the VE was told to assume that the individual described could also not lift or carry more than five pounds. (Tr. 53)  With this restriction, the VE testified

that no jobs would be available because, in order to do sedentary work, you must be able to lift at least 10 pounds.  (Tr. 53-54)

For hypothetical number four, the VE was also told to assume that the individual described was going to be off-task at least 20% of the workday. (Tr. P. 54) With this assumption, the VE also indicated that no jobs would be available, because, although not specifically addressed in the Dictionary of Occupational Titles, such a person would be non-competitive. (Tr. 54)

When questioned by Lovejoy's attorney, whether jobs would be available for the hypothetical worker described if he can only occasionally push, pull and reach in all directions and requires a sit/stand option at-will and changing positions every 15-30 minutes, the VE stated that such an individual would be rendered non-competitive and there would be no work.  (Tr. 55)

## III.  Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]....

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV.  The ALJ's Decision

The ALJ issued a decision on March 21, 2014.  A summary of his findings is as follows:

1. Lovejoy met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 14)

2. Lovejoy had not engaged in substantial gainful activity since December 10, 2011, the alleged onset date.  (Tr. 14)

3. Lovejoy has the following severe impairments: lumbar disc displacement status post left L4-5 discectomy, multilevel spondylosis of the lumbar spine,

obesity, degenerative disc disease of the cervical spine, major depressive disorder, generalized anxiety disorder and lumbar radiculitis.  (Tr. 14)

4.  Lovejoy does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 15-16)

5.  Lovejoy has the residual functional capacity ("RFC") to perform sedentary work, except he cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs.  He can occasionally stoop, kneel, crouch, and crawl.  Lovejoy can understand, remember, and carry out simple instructions and perform simple, routine tasks.  He can perform low stress work, defined as work not subjecting him to strict quotas or fast-paced high production demands or work not requiring negotiations, arbitration, confrontation, directing the work of others, or being responsible for the safety of others.  He requires a relatively static work environment where changes occur infrequently and are adequately and easily explained.  Lovejoy can interact superficially with the public and coworkers.  (Tr. 16-17)

6.  Lovejoy is unable to perform any past relevant work.  (Tr. 21)

7.  Lovejoy was born on November 6, 1971 and was 40 years old, which is defined as a younger individual age 18-44 on the alleged disability onset date.  (Tr. 21)

8.  Lovejoy has a marginal education and is able to communicate in English.  (Tr. 21)

9.  Transferability of job skills is not material to the determination of disability.  (Tr. 21)

10.  Considering Lovejoy's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 21-22)

Based on the foregoing, the ALJ determined that Lovejoy had not been under a disability from December 10, 2011 through the date of the decision.  (Tr. 22)

## V. Parties' Arguments

Plaintiff filed a brief on December 8, 2015.  Plaintiff argues that the ALJ erred in not following the treating physician rule and in his assessment of Lovejoy's residual functional

capacity. (Doc. 13, pp. 10-14)  Plaintiff also argues that the ALJ's determination that Lovejoy is not disabled by pain is not supported by substantial evidence.  (Doc. 13, pp. 14-16)

Defendant filed a brief on January 22, 2016.  Defendant contends that there is substantial evidence supporting the ALJ's decision that plaintiff has the residual functional capacity to perform sedentary work. (Doc. 14, pp. 8-11)  Defendant argues that the ALJ appropriately weighed the opinions of each medical source. (Doc. 14, pp. 8-11)  Defendant also contends that the ALJ reasonably found plaintiff's subjective complaints less than fully credible.  (Doc. 14, pp. 9, 12-13)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v.Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).   This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010,  2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## B.   Treating Physician Rule

The first argument raised by plaintiff is whether the ALJ erred in his assessment of residual functional capacity and the weight given to plaintiff's treating physician, Dr. Escobar. (Doc 13, p. 1)   The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine

what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers,* 486 F.3d at 243.  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

In forming his decision that Lovejoy has the residual functional capacity to perform sedentary work, the ALJ did not afford controlling weight to Dr. Escobar's assessment that Lovejoy could only occasionally lift three to five pounds.  20 C.F.R. § 404.1567 states, "sedentary work involves lifting no more than 10 pounds."  Despite the fact that Dr. Escobar was the only treating physician to provide an estimate of plaintiff's physical capacity, the ALJ rejected this assessment.  In considering Dr. Escobar's opinion, the ALJ stated:

> I grant little weight to Dr. Escobar's opinion.  Although he treated the claimant, the evidence does not support the substantial restrictions that Dr. Escobar described.  The claimant generally retained normal strength, suggesting he was capable of lifting at least weight consistent with the sedentary level.  Moreover, the claimant did not demonstrate substantial temperature sensitivity and there was no explanation for why he could not be around hazards.  Additionally, the

> claimant did not display severe concentration problems on exam and he did not have ongoing lower extremity swelling necessitating elevation of his legs throughout the day.

While the ALJ provides this brief explanation as to why he has afforded little weight to Dr. Escobar's opinion, he has not provided sufficiently specific "good reasons" for rejecting Dr. Escobar's assessment. The ALJ has not indicated that Dr. Escobar's opinion was unsupported by medically acceptable clinical and laboratory diagnostic techniques. The ALJ seems to be stating that Dr. Escobar's opinion is inconsistent with other evidence in the record when he states that "the claimant generally retained normal strength," but the ALJ does not indicate from what source(s) this opinion is derived. It could simply be his own opinion, as suggested by plaintiff. It is unclear from his decision whether the ALJ is basing this opinion of "normal strength" on the office notes of Dr. Akhtar-Zaidi or on the testimony of Lovejoy at the hearing. Either way, the ALJ did not provide sufficiently specific support for this opinion.

As stated above, the ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [T]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (quoting *Wilson v. Comm'r of Soc Sec.* 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.

In the present matter, the ALJ determined that Lovejoy was able to lift more than the three to five pound assessment of Lovejoy's treating physician.  The ALJ did not provide a sufficiently specific explanation as to why he discounted the treating physician's opinion or how he arrived at the decision that Lovejoy was capable of lifting 10 pounds.  When the ALJ formed a hypothetical question involving a worker who could perform sedentary work (involving being able to lift at least 10 pounds), the VE opined that there were several jobs that such an individual could perform.  However, when the ALJ changed the hypothetical to an individual who couldn't lift more than five pounds, the VE stated that there would not be jobs for this person because sedentary work requires being able to lift 10 pounds.

The court recognizes that, in some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error."  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she

has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. Appx. at 551.

Here, however, the ALJ simply indicates that the evidence does not support the substantial restrictions described by Dr. Escobar.  The ALJ concludes that Mr. Lovejoy retained normal strength.  However, the ALJ does not explain how he has come to this conclusion.  Moreover, after each of his office visits, Dr. Escobar advised Lovejoy to avoid heavy lifting, pushing, or anything that would flare his symptoms.  This evidence in Dr. Escobar's records *does* support the limitations described in the medical source statement Dr. Escobar submitted.  Thus, the court finds that the ALJ's failure to provide sufficiently specific good reasons for discounting Dr. Escobar's opinion as to the lifting limitations of Mr. Lovejoy is not "harmless error" in this case.  Although there may have been good reasons to reject Dr. Escobar's opinion, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review.

### C.  ALJ's Determination Regarding Subjective Complaints of Pain

In his second assignment of error, Lovejoy argues that the ALJ's determination that he is not disabled by pain is not supported by substantial evidence. (Doc. 13, pp. 14-16)   The ALJ's

decision calls into question the credibility of the plaintiff and whether his alleged pain was as severe as reported. (Doc. 11, pp. 20-21)  Tolerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant.  *Houston v. Sec'y of H.H.S.,* 736 F.2d 365, 367 (6th Cir. 1984).  Moreover, the ALJ's finding regarding the credibility of a claimant's testimony is entitled to great deference.  *Heston v. Comm'r of Soc. Sec.,* 245 F3d. 528, 536 (6th Cir. 2001).  "It is for the Secretary and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony." *Myers v. Richardson,* 471 F.2d 1265, 1267 (6th Cir. 1972) (citing *Celebrezze v. Sutton*, 338 F.2d 417, 421 (8th Cir. 1964)).  While the court recognizes that the ALJ's decision related to Lovejoy's complaints of pain may be entitled to some deference, it is unnecessary for the court to fully consider Lovejoy's second argument at this time.  The court has already recommended that this case be remanded so that the ALJ may specifically explain the good reasons for discounting the strength assessment assigned by Mr. Lovejoy's treating physician, Dr. Escobar.  Consequently, it is unnecessary for the court to fully consider the second assignment of error at this time.

## VII.  Conclusion

For the foregoing reasons, the court finds the decision of the Commissioner was not supported by substantial evidence.  It is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/Thomas M. Parker
Thomas M. Parker
United States Magistrate Judge

Date: April 18, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).**